Corey S. WRIGHT *v.* STATE of Arkansas

CR 06-774                                        249 S.W.3d 133

Supreme Court of Arkansas
Opinion delivered February 1, 2007

*Phillip A. McGough, P.A.*, by: *Phillip A. McGough*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Nicana Corinne Sherman*, Ass't Att'y Gen., for appellee.

PAUL DANIELSON, Justice. Appellant Corey S. Wright brings this criminal appeal from his convictions for murder in the first degree and arson and his sentences to a term of life imprisonment and a term of fifteen years. He raises two points of

error: (1) that the circuit court erred by admitting hearsay testimony, and (2) that the circuit court erred by not directing a verdict for him on the charge of arson. We affirm.

A review of the record reveals the following facts. On the morning of Tuesday, December 3, 2002, Dorothy Thompson, the victim's mother, was concerned about her daughter, Sharlene Grissom, and attempted to reach her by phone. When Sharlene, the victim, did not answer her phone, Thompson decided to get out of bed and go to Sharlene's home. Thompson, accompanied by her husband, found Sharlene dead in her mobile home, which was also on fire. Sharlene proved too heavy to be moved and when she did not respond, Thompson rushed to the neighbor's phone to call the police.

One of the firemen responding to the fire at Sharlene's home noticed the appellant walking in the opposite direction from the crime scene. Appellant Wright was later detained by the fire chief and was identified as the same man seen earlier walking along the highway. Sharlene Grissom and the appellant had a child together and had been in a relationship for several years; however, there was evidence of an altercation that occurred between the two on the Sunday before the Tuesday morning that Sharlene was found dead. That altercation resulted in the appellant being removed from Sharlene's mobile home early Sunday morning by her family.

Medical testimony revealed that Sharlene had been strangled to death. Vaginal and rectal swabs detected spermatozoa cells, with odds of excluding the appellant being less than one in one trillion. In addition, the testimony revealed that spermatozoa cells could not be detected in the rectum beyond approximately twenty-four hours, which placed the appellant in recent contact with Sharlene. It was also determined that she was deceased before the fire started.

Wright was tried by a jury on March 27, 2006, and was convicted of murder in the first degree and arson. As previously stated, he was sentenced to life imprisonment for the first-degree murder conviction and fifteen years on the arson conviction. Thus, this court's jurisdiction is proper pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

## I. Sufficiency of the Evidence

Wright alleges that the circuit court erred by not directing a verdict in his favor on the arson charge. While this argument is not the first argument presented by the appellant, for double-jeopardy

purposes, we will review this issue first to be consistent with our case law. *See Holsombach v. State*, 368 Ark. 415, 246 S.W.3d 871 (2007). The State argues that the circuit court correctly denied the appellant's directed-verdict motion, as there was sufficient evidence to convict him of arson.

A motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *See Davis v. State*, 368 Ark. 401, 246 S.W.3d 862 (2007). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *See id.* Substantial evidence is that evidence forceful enough to compel the fact-finder to make a conclusion one way or the other beyond suspicion or conjecture. *See id.* When determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State, and we will only consider the evidence that supports the verdict. *See id.*

A person commits arson if he or she starts a fire or causes an explosion with the purpose of destroying or otherwise damaging an occupiable structure or motor vehicle that is the property of another person. *See* Ark. Code Ann. § 5-38-301(a)(1)(A) (Repl. 2006). Wright argues that the evidence presented by the State was not sufficient to overcome the common-law presumption against arson. Further, he contends that the decision by the jury that this fire was an arson fire, instead of an accidental cooking fire or equipment malfunction, required the jury to speculate. We disagree.

First, there was considerable evidence that the appellant was at the crime scene. Wright claimed that he was on his way to Stamps on Tuesday morning, but that he never made it past the First Baptist Church in Buckner before he was picked up. His statement runs counter to the statements of Chris Kilcrease, a firefighter, and Martha Brock, the daughter-in-law of Sharlene's next-door neighbor. Chris Kilcrease was responding to the fire at Sharlene's home when he saw appellant walking east on the Old Buckner highway, away from the crime scene. Kilcrease later identified the appellant as the same person he had seen walking away from the crime scene. Martha Brock testified that, as she drove toward Sharlene's, to her mother-in-law's, she saw someone walking on Old Buckner road, but as she got closer to the pedestrian, he put his hands over his face. She believed the pedestrian was trying to hide his face from her as she drove past him. Brock also testified that her truck was parked at her mother-in-law's home about three days a week and that the appellant

would have known it was her when he saw the truck. In addition, Roger McBride, who handled a bloodhound as a reserve deputy for the Nevada County Sheriff's Office, testified that his select-scent dog,[1] Belle, tracked Wright's scent 1.8 miles from County Road 24 to the back door of Sharlene's mobile home.

Medical testimony further revealed that spermatozoa cells were present on both the vaginal and rectal slides of the victim and that spermatozoa could generally live only for a maximum of twenty-four hours in the rectum because of the harshness of that environment. Wright's DNA was present on the rectal swab taken from the victim, and a forensic chemist testified that the probability of selecting an individual at random from the general population having the same genetic markers as those from the appellant would be one in one trillion. This medical evidence counters the appellant's statement about never making it to Stamps and gives rise to an inference that appellant had sexual relations with Sharlene close to the time she died.

In addition to the evidence suggesting that the appellant was at the crime scene around the time of Sharlene's death, and, therefore, that he had a motive to destroy any evidence of his actions, medical evidence showed that Sharlene was dead before the fire began, implying that she did not start it. The doctor for the State testified, based on the autopsy report, that there was no presence of soot in Sharlene's airways, nor was there a presence of carbon monoxide in her tissues, all of which indicated that Sharlene was dead before the fire.

Finally, Scott Clark, the lead investigator on the fire, ruled out any electrical malfunction as the cause of the fire. The fire was confined to the kitchen area and appeared to have started at or near the stove. Clark testified that there was a pan on the stove containing the remains of some type of meat product; however, he testified that it looked as though a greasy, flammable substance had been poured on the stove itself. The substance was also present on the counter top, countering any theory that a greasy substance, such as cooking oil, had originally been in the pan and simply boiled over onto the stove. Clark further testified that he found no cooking-oil containers during his investigation.

---

[1] McBride testified that a select-scent dog can be given a scent article of a specific scent of a person and will then follow the trail of that scent.

■ Based upon the foregoing evidence, we hold that there was substantial evidence to support the jury's verdict and that the jury did not have to resort to speculation concluding that the appellant was guilty of arson, and we affirm the appellant's conviction and sentence for arson.

## II. Hearsay Testimony

Wright next argues that the circuit court erred by admitting the testimony of Thompson, Sharlene's mother, and three of Sharlene's co-workers because it was hearsay and did not fall under the excited-utterance exception to the hearsay rule. The State avers that the circuit court did not abuse its discretion by admitting that evidence.

Arkansas Rule of Evidence 803(2) reads:

> (2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Ark. R. Evid. 803(2) (2006). We have discussed several factors to be considered when determining if a statement is an excited utterance. *See Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005). The lapse of time, the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event, and the subject matter of the statement are all factors to be considered. *See id.* Furthermore,

> [f]or the exception to apply, there must be an event which excites the declarant. In addition, "[i]n order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation." The statements must be uttered during the period of excitement and must express the declarant's reaction to the event. It is for the trial court to determine whether the statement was made under the stress of excitement.

*Id.* at 42, 207 S.W.3d at 480-81 (internal citations omitted).

Here, Thompson testified that her daughter called her around 3:15 a.m. on the Sunday morning before her death, sounding tired and scared. Before allowing Thompson to testify as to what her daughter actually told her on the phone, the circuit

court heard the testimony in camera to make a ruling on its admissibility. Thompson was allowed to relay the following information to the jury:

> And [Sharlene] told me, said: Mama, [she] said me and Cory been fighting and she said he raped me [for] about two [to] three hours and [she] said he tried to put a sack over my head. He tried to kill me. She said: I would say the Lord's prayer and he would stop. And said he [would] start again, I would say the Lord's prayer and he would stop. And she said: I got away from him. I said: Well how did you call me. She said: I ran in the room with the cell phone and said that's how I called you. She said: You might ought to come down here.

Thompson also testified that the next morning her daughter tried to show her where the appellant had yanked her hair out during the assaults.

Three co-workers were also allowed to testify about statements Sharlene made to them on Monday while they were on shift at Tyson.[2] Evelyn Smith testified that, early in the shift on Monday afternoon, Sharlene was not acting normal and was very upset. She testified that Sharlene told her that the appellant had choked her the day before and that the only reason he did not kill her was because she questioned him about who would raise their child. In addition, she testified that Sharlene also said that the appellant had raped her on the same evening as the fight.

Kelly Muldrew, a second co-worker, testified that around 5:00 p.m. on Monday she found Sharlene hiding in the box room. Muldrew testified that Sharlene burst into tears and told her about an argument that she had with the appellant. She stated that Sharlene explained that the appellant had strangled her with an extension cord, raped her, and told her that he was going to kill her and throw her body into the lake and that nobody else would ever know what happened to her. Muldrew also testified that Sharlene believed that the only reason the appellant did not kill her was because she had asked him who would raise their child if he killed her and went to jail.

---

[2] The events that occurred between Sharlene and Wright took place early Sunday morning at approximately 3:15 a.m. After those events, Wright was promptly removed from Sharlene's home by her family. Sharlene began her shift at Tyson at 3:00 p.m. the next day, Monday. The record does not provide us with an explanation of what Sharlene did between the time Wright was removed from her home and her shift began the next day.

Finally, Angela White testified that Sharlene was very upset at work and told her about an argument she had with the appellant. White testified that Sharlene told her that she had tried to tell the appellant that it was over and that he put a bag over her head, tried to strangle her, and beat her. She stated that Sharlene was "swoll." White also testified that Sharlene told her that the appellant had said that if he could not have her, then no one would and that the appellant raped her. Furthermore, White testified that the appellant had called White on her cell phone, after getting her number off of Sharlene's cell phone, and asked her to talk to Sharlene for him and to get her to call him. According to White, the appellant had repeatedly called Sharlene that night at work and even made calls to the Tyson switchboard, but Sharlene would not go to the phone. White stated that she attempted to get Sharlene to stay with her mother that night; however, Sharlene said she was going to go home and then go to the police the next morning.

The circuit court allowed all of the above testimony to be introduced as excited utterances of the victim. The circuit court further ruled that the statements went to the demeanor and the relationship of the parties, as well as to a possible motive in the case. Wright alleges that the statements were not excited utterances due to the lapse of time between the altercation and the statements and because Sharlene was not in danger when she made the communications.

As previously noted, it is for the circuit court to determine whether a statement was made under the stress of excitement. *See Davis v. State, supra.* The circuit court has wide discretion in making evidentiary rulings, and we will not reverse its ruling on the admissibility of evidence absent an abuse of discretion. *See Brunson v. State,* 368 Ark. 313, 245 S.W.3d 132 (2006).

Here, the circuit court heard each witness's testimony outside of the presence of the jury before ruling that Sharlene's statements were excited utterances. Regarding Thompson's testimony, the circuit court found that Sharlene's statements to her mother occurred at the time of the startling event, the altercation with the appellant. Our review of the evidence reveals that Sharlene was extremely excited when she made the phone call to her mother, as the appellant was still present in her home, and all of her statements were in reaction to the altercation with the appellant. Thus, we hold that this evidence falls within the

excited-utterance exception to the hearsay rule, and the circuit court did not abuse its discretion in admitting Thompson's testimony.

We turn then to the testimony of the victim's co-workers: Evelyn Smith, Kelly Muldrew, and Angela White. A review of the record reveals that the interval of time between the altercation and Sharlene's statements to her friends at work was approximately thirty-six hours.[3] We have recognized that the lapse of time between a startling event and a statement regarding that event is not dispositive in determining the application of the excited-utterance exception. *See Davis v. State, supra.* In fact, the trend has been toward expansion of that time interval. *See id.; see also Peterson v. State,* 349 Ark. 195, 76 S.W.3d 845 (2002) (approving admission of assertion of abuse the morning after the event); *Fudge v. State,* 341 Ark. 759, 20 S.W.3d 315 (2000) (approving admission of assertion of abuse "one to several hours" after the event). However, the more liberal cases appear to be cases in which the declarant has been a child. *See Smith v. State,* 303 Ark. 524, 798 S.W.2d 94 (1990) (discussing cases from various jurisdictions in which assertions of abuse were admitted despite varying temporal intervals, ranging from fifteen hours after the event to as many as several days after the event).

Here, the thirty-six hour temporal interval alone does not exclude these statements from being excited utterances; however, there are other factors that we must take into consideration such as Sharlene's age, her physical and mental condition, the characteristics of the event, and the subject matter of the statement. *See Davis v. State, supra.* In addition, we find the following language used by the court in *Blandenburg v. State,* 890 So. 2d 267 (Fla. Dist. Ct. App. 2004), particularly persuasive and instructive:

> Indeed, courts have found the exception applicable to statements made well after the occurrence of the startling events to which the statements relate. The common thread running through those cases, however, is that at the time of the statement, the declarants were either "hysterical," severely injured, or subject to some other extreme emotional state sufficient to prevent reflective thought.

> . . . .

---

[3] As previously noted, the record does not reveal what Sharlene was doing during that thirty-six hours or what her state of mind might have been.

On the other hand, 'A statement as to what occurred does not become admissible merely because the victim is still in an excited state.'

. . . .

As the interval of time between the startling event and the statement increases, so too does the opportunity for the declarant to engage in reflective thought.

*Blandenburg v. State*, 890 So. 2d at 270 (internal citations omitted).

█ In the instant case, the victim is an adult, not a child, who chose to recount the previous day's events to three co-workers. The record reveals that Sharlene told Angela White that she was going to go home and then go to the police the next morning. Thus, while Sharlene was understandably still upset from the events that occurred between her and the appellant, it does not appear that she was in a state of hysterics. Instead, it appears as though Sharlene's conversations with her friends at work were the product of some reflection and deliberation on those events. Therefore, we conclude that allowing the testimony of these three witnesses as excited utterances was an abuse of discretion, as the facts do not establish that Sharlene's statements were spontaneous, excited, or impulsive.

█ That being said, the testimony of Evelyn Smith, Kelly Muldrew, and Angela White was merely cumulative to the testimony of Thompson. We have repeatedly held that prejudice is not presumed and that no prejudice results where the evidence erroneously admitted was merely cumulative. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). Moreover, we do not reverse for harmless error in the admission of evidence. *See id*. Accordingly, because the admission of the co-workers' testimony was harmless error due to its cumulative nature, we affirm on this point as well.

### III. 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to the appellant, and no prejudicial error has been found. *See Holsombach v. State, supra*.

Affirmed.